UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

**REPORT,**
**RECOMMENDATION**
**AND ORDER**

v.

21-CR-0091(JLS)(JJM)

ESTEVEN MATOS,

                    Defendant.

_____

      Defendant Esteven Matos is charged (along with two co-defendants) in a six-count Indictment [32][1] with a narcotics conspiracy and related drug charges arising from the search of a United States Postal Service ("USPS") parcel addressed to 1326 Electric Avenue, Lackawanna, New York, and subsequent November 3, 2020 controlled delivery of that parcel. Before the court are the remaining portions of Matos's omnibus motion [42][2] and motion to suppress [57], as well as the government's cross-motion for reciprocal discovery. *See* Government's Response [45] at 29.[3]

      Having considered the parties' submissions [42, 45, 57-59, 64-65, 69-70, 73-74] and heard oral argument on July 18, 2022 [63], the government's cross-motion is granted, Matos's remaining non-dispositive motions are granted in part and denied in part, and I further recommend that Matos's motion to suppress be denied.

---

[1]     Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

[2]     In an August 1, 2022 submission [70], Matos identified the portions of his omnibus motion [42] that remain in dispute.

[3]     No pretrial motions were filed by co-defendants Felix Ayende and Lydia Cortes.

**BACKGROUND**

The charges in this case arise from an October 29, 2020 search warrant [58-1] signed by Hon. Michael J. Roemer for a USPS Priority Mail Express parcel weighing approximately 11 lbs., addressed to "Antonio Cortes" at 1326 Electric Avenue in Lackawanna New York, and bearing the return address of "Angela Ortiz Cruz HC 01 Box 9473 Toa Baja, P.R. 00951". 20-mj-5277.  The warrant was supported by the October 29, 2020 Affidavit of United States Postal Inspector Brendan Jaffe. Id. at 2-9.  Based on his training and experience, Inspector Jaffe identified a number of characteristics that Priority Mail Express and Priority Mail parcels containing contraband often share, including the use of handwritten labels, the payment of postage in cash, heavily taped seams, shipped from locations that are known sources of controlled substances, and the use of fictious names and return addresses. Id. at 5-6, ¶8.

On October 26, 2020 postal inspectors in Buffalo, New York were alerted to the parcel because it was a Walmart box, shipped from Puerto Rico, a known source location for the distribution of controlled substances, with a handwritten label and excessively taped seams. Id. at 7, ¶9.  A check of law enforcement databases the following day revealed that "the sender and recipient information appear[ed] to be fictitious". Id. at ¶10.  Based on these factors, Inspector Jaffe decided to submit the parcel to a trained narcotics detecting canine for examination. Id. at 8, ¶11.

Inspector Jaffe's Affidavit attached two Affidavits from Niagara Frontier Transportation Authority Officer Nicholas Nesci.  Officer Nesci attested that he and his canine "Zev" were initially certified as a Narcotics Detection Team in March of 2017 by the New York State Division of Criminal Justice Services, had been recertified in March of 2020, and continued

-2-

to receive a minimum of 24 hours of training each month for patrol and narcotics. Id. at 10. He

explained that Zev is a passive alert K-9 that is certified in detecting odors of marijuana, cocaine,

heroin, ecstasy, methamphetamines and their derivatives. Id

   According to Officer Nesci, on October 29, 2020 he directed Zev to

conduct a sniff of a secured office area of the United States Postal Inspection Service to establish

that it was free of any narcotics. Id. at 11. Inspector Jaffe next placed the subject parcel in the

office with "an array of similar parcels known not to contain controlled substances". Id. The

subject parcel was not identified to Office Nesci. Id. When Zev was unleased and searched the

entire secured office area, he alerted, with a passive alert, only to the subject parcel for the odor

of narcotics. Id. at 8, ¶11 and 11.

    On November 3, 2020, I signed a search warrant for 1326 Electric Avenue,

Apartment 1. See 20-mj-1158 [1]. The Supporting Affidavit of United States Drug Enforcement

Administration Task Force Officer ("TFO") Matthew Gould (id. at 2-13) stated that when the

parcel warrant was executed, it revealed several items including a "box labeled 'SUTRA' hair

care products", and after the packaging material inside that box was removed, a brick of cocaine

weighing approximately one kilogram was discovered. Id. at ¶4. To facilitate a controlled

delivery of the parcel, TFO Gould stated that the cocaine would be replaced with "sham", and a

transmitter placed in the parcel to alert law enforcement if the parcel was opened. The search

warrant permitted the search to occur whether or not the parcel was accepted or taken into the

residence upon delivery. Id., ¶10.

   Shortly after the warrant for 1326 Electric Avenue was signed, the parcel was

delivered and brought into the residence by co-defendant Felix Ayende. Government's Response

[58] at 4.  After a short time, Matos arrived at the residence and the transmitter alerted that the parcel had been opened, prompting law enforcement to execute the warrant. Id.

Matos seeks to suppress the evidence derived from the parcel search, including the evidence seized from the subsequent search of 1326 Electric Avenue. Notice of Motion [57] at 2.  In support of the motion, Matos submitted a Declaration of standing [57-3], acknowledging that on October 23, 2020, while vacationing in Puerto Rico, he mailed the subject parcel to himself. Id., ¶4.  Matos explains that "[d]esiring to remain anonymous, I exercised my First Amendment right to do so by preparing and packaging a parcel of mail using . . . alter egos", including a "fictious sender's name and address", as well as a "fictious recipient . . . which I addressed to my mother's residence [at 1326 Electric Avenue], with no apartment designation". Id., ¶5.  He further concedes that he arrived at his mother's residence, the lower apartment of 1326 Electric Avenue, on November 3, 2020 to retrieve the parcel and that when he opened it, law enforcement entered the apartment. Id., ¶7.  Although Matos admits that he did not reside at his mother's residence, he "frequented" the home and "on many occasions [was] an overnight guest". Id., ¶8.


**DISCUSSION**

A.    **Matos's Motions**

    1.    **Motion to Suppress**

The parties sharply dispute Matos's standing to seek suppression of the parcel. *See* Matos's Memorandum [57-2] at 1-5; government's Response [58], 6-9; Matos's Reply [59] at 2-5.  A defendant seeking suppression bears the burden of establishing his standing. *See*

United States v. Pena, 961 F.2d 333, 336 (2d Cir. 1992). To establish standing, a defendant must establish that he had an expectation of privacy that was both subjectively and objectively reasonable - that is he must demonstrate that he had a subjective expectation of privacy that "society is prepared to recognize as reasonable". Smith v. Maryland, 442 U.S. 735, 740 (1979). "[T]he extent of a defendant's property or possessory interest in the place searched is a factor generally considered in determining the reasonableness of a defendant's expectation of privacy". United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997).

Since "[i]t has long been recognized that citizens have a legitimate expectation of privacy in their own sealed letters and packages", there is "no question that if defendant['s] name[ ] appeared on any of the packages as the sender or addressee [he] would have had a legitimate expectation of privacy in the package[ ] and could challenge the legality of the warrant[ ] authorizing the[ ] search." United States v. DiMaggio, 744 F. Supp. 43, 46 (N.D.N.Y. 1990). However, neither party cites any controlling authority concerning whether an individual has a legitimate expectation of privacy in the contents of a package that names a fictitious sender or recipient.

In DiMaggio, the court concluded "[t]hat expectation of privacy vanishes . . . when the identity of the sender and intended recipient is not indicated . . . on the package." 744 F. Supp. at 46. Relying on an abandonment theory, it explained that when the true sender's identity is withheld, the sender "has effectively repudiated any connection or interest in the item vis-a-vis society . . . and no longer has the means to exclude others from intruding upon the contents of the package." Id. Likewise, where "the intended recipient has opted to conceal his identity, he can not assert a cognizable Fourth Amendment interest in the package while it is in

-5-

transit because he has chosen not to announce to society that he has a legitimate claim to the sealed contents of the package". Id.

However, DiMaggio is not the sole (or even prevailing) view on this issue. *See* United States v. Villarreal, 963 F.2d 770, 774 (5th Cir. 1992) ("individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names"); United States v. Suarez, 2021 WL 3667011, *5 (S.D. Fla. 2021) ("[i]ndividuals may . . . assert a reasonable expectation of privacy in packages addressed to them under fictitious names"). Despite the use of fictious senders and recipients, many courts, including those from this circuit, have found an expectation of privacy as long as the defendant is able to establish some connection to the addressee. *See also* United States v. Barrios, 1995 WL 728440, *3 (S.D.N.Y. 1995), aff'd, 210 F.3d 355 (2d Cir. 2000) ("[o]ne who is not the sender or addressee may challenge a search or seizure of mail if other factors show she had a subjective and objectively reasonable expectation of privacy. A claim of ownership of the mail's contents may evince such an expectation"); United States v. Campbell, 434 F. App'x 805, 809 (11th Cir. 2011) ("[a] defendant may have a reasonable expectation of privacy in a package even where the package is not addressed in the defendant's name, provided that he establishes a connection between himself and the addressee"); United States v. Stokes, 829 F.3d 47, 52 (1st Cir. 2016) ("many of the federal courts of appeals have been reluctant to find that a defendant holds a reasonable expectation of privacy in mail where he is listed as neither the sender nor the recipient, at least absent some showing by the defendant of a connection, and here Stokes has shown none"); United States v. Yodprasit, 2020 WL 3120991, *4 (N.D. Iowa), adopted, 2020 WL 1076044

(N.D. Iowa 2020) ("[m]ost courts . . . have held that a defendant has standing to object to the search of a package addressed to him at his residence under a fictitious name or 'alter ego'").

In any event, I need not resolve these conflicting authorities, since even if Matos had standing to contest the search of the parcel, for the reasons discussed below, he offers no basis to warrant suppression or a hearing on that issue. *See* <u>Byrd v. United States</u>, __U.S.__, 138 S. Ct. 1518, 1530 (2018) (Fourth Amendment "standing" is "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search.  Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim").

In seeking suppression, Matos acknowledges that he "does not contest the validity of the search warrant", but rather bases his motion on the following five arguments:

--    "the seizure and detention of the package by US Postal Inspectors was not based on reasonable suspicion";

--    "the package was retained for an unreasonable length of time";

--    "the dog sniff was an unlawful warrantless search";

--    "the 'sniff test' of his package . . . was conducted in a manner that tainted the dog's reaction"; and

--    "the search of containers found within the mailed package was not based on probable cause and beyond the scope of the search warrant".  Notice of Motion [57] at 1.

Each of these arguments are addressed below.

i.    **Reasonable Suspicion**

It is well settled that "postal authorities may detain packages - *i.e.*, remove them from the normal flow of mail - for a reasonable amount of time, if they have a reasonable suspicion of criminal activity". United States v. Villegas, 2016 WL 10892326, *3 (W.D.N.Y. 2016), adopted, 2018 WL 783122 (W.D.N.Y. 2018).  Reasonable suspicion "is evaluated under a totality of the circumstances standard". Id.  In United States v. Van Leeuwen, 397 U.S. 249, 252 (1970) the Supreme Court held that several factors, including "[t]he nature and weight of the packages" and the use of a "fictitious return address . . . justified detention, without a warrant, while an investigation was made".

Similar factors were present here.  Postal Inspector Jaffe stated that the subject package "shared characteristics known to be associated with packages containing narcotics, as it is a Walmart box, it has a hand written label, excessively taped seams, and was shipped from Puerto Rico, a known source location for the distribution of narcotics". Jaffe Affidavit [58-1], ¶9. Notably, he also confirmed that "both the sender and recipient information appears to be fictitious". Id., ¶9.  These are sufficient to establish reasonable suspicion for the search and Matos's arguments do not compel a different conclusion.

Noting that Inspector Jaffe had only been a Postal Inspector for 17 months, Matos contends that "[i]t is obvious, based on the totality of the circumstances, that Inspector Jaffe, relying on his limited training and experience, merely used the innocuous characteristics of the subject package and exploited the facts and circumstances of the package". Matos's Memorandum [57-2] at 7, 11.  In particular he notes that there was an innocent explanation for the use of a handwritten label and Walmart box, explaining that Toa Baja, the City from which

-8-

the package was sent, has only one US Postal Office and that it uses private carriers on Highway

Contract Routes ("HCR"), thereby making the use of handwritten labels and "whatever available

containers" by "customers along the HCR routes . . . regularl[ ] and expected[ed]." Id. at 10.

Matos further contends that Inspector Jaffe erroneously "focused heavily on business commerce

use of the USPS priority mail", rather than "personal individual use by ordinary citizens". Id. at

7.

      Contrary to Matos's contention that Inspector Jaffe relied on "innocuous

characteristics" to detain the parcel, courts have recognized that "certain traits are commonly

encountered in the vast majority of illicit mailings of drugs (commonly referred to as 'drug

package profile' characteristics)", United States v. Martinez, 25 F.4th 303, 306–07 (5th Cir.

2022), including the "(1) size and shape of the package; (2) package taped to close or seal all

openings; (3) handwritten or printed labels; (4) unusual return name and address; (5) unusual

odors coming from the package; (6) fictitious return address; and (7) destination of the package".

United States v. Lux, 905 F.2d 1379, 1380 n. 1 (10th Cir. 1990). *See also* Villegas, 2016 WL

10892326 at *3 (applying the Lux drug package profile characteristics); United States v. Goodin,

2019 WL 2385871, *5 (W.D. La.), adopted, 2019 WL 2383227 (W.D. La. 2019) ("[a]n officer

may detain packages for investigative purposes when there is reasonable suspicion of criminal

activity, such as when the package 'meets a drug package profile'").  While Matos offers an

innocent explanation for some of the characteristics identified by Inspector Jaffe,

"[c]haracteristics consistent with innocent use of the mail can, when taken together, give rise to

reasonable suspicion". United States v. Demoss, 279 F.3d 632, 636 (8th Cir. 2002).  Inspector

Jaffe's experience, which was set forth in his Affidavit ([58-1], ¶¶1-2), even if limited, also did

not erode the existence of reasonable suspicion to detain the package.  Therefore, I recommend that this portion of Matos's motion be denied.

### ii.    Duration of the Package's Detention

As discussed above, "[a] package may be temporarily detained without a warrant for purposes of investigation, provided that (1) law enforcement authorities have a reasonable suspicion of criminal activity; and (2) the packages are not detained for an unreasonable length of time before a search warrant is secured." United States v. Kamaldoss, 2022 WL 1200776, *15 (E.D.N.Y. 2022). As to the second prong, "the following four factors are generally relevant to whether the police have waited an unreasonable amount of time before seeking a search warrant: (1) the length of the delay, (2) the importance of the seized property to the defendant, (3) whether the defendant had a reduced property interest in the seized item, and (4) the strength of the state's justification for the delay". United States v. Smith, 967 F.3d 198, 206 (2d Cir. 2020).

The parties dispute the period of the delay.  Whereas Matos argues that there was a "four-day delay" prior to the package being subject to the canine sniff (Matos' Memorandum [57-2] at 11),[4] the government contends that the delay was approximately two days because the "[d]elay does not begin to accrue until the expected delivery date [of October 27, 2020] has passed, as that is when the alleged possessor interest began". Government's Response [58] at 15 (citing United States v. LaFrance, 879 F.2d 1 (1st Cir. 1989)).  In any event, neither a two nor a four-day delay is unreasonable when considered with the other factors. See United States v.

---

[4]    Although Matos measures the delay through when the dog sniff occurred, rather than through when the search warrant was obtained, the warrant was obtained later that same day.

Martin, 157 F.3d 46, 54 (2d Cir. 1998) (an 11-day delay in obtaining a package warrant - a period that included two weekends and the Christmas holiday - was not unreasonable); United States v. Okparaeke, 2018 WL 4003021, *12-13 (S.D.N.Y. 2018) (finding a 42-day delay in securing a search and seizure warrant for a mail to not be unreasonable based on all of the factors).

Since the contents of the package were not personal effects, but rather controlled substances, the second factor - *i.e.*, the importance of the seized property to Matos - weighs strongly toward finding the delay reasonable. *See* Kamaldoss, 2022 WL 1200776, *15 (where "the packages were not personal effects" but rather "misbranded drugs" for distribution, "their importance [to defendants] was minimal at best"). Likewise, because of Matos's use of a fictious sender and recipient on the package, the third factor - *i.e.*, whether Matos had a reduced property interest in the seized item - weighs heavily in favor of finding the delay reasonable. *See* id. (where the defendants used a fictious name and return address, the court noted that "there is strong reason to believe that it would have been difficult, if not impossible, for [the defendants] to retrieve their packages if they had so desired", thereby "substantially reduc[ing]" their possessory interests in the packages).

By contrast, in the absence of any explanation from the government for the delay, the fourth factor favors Matos. However, on balance, consideration of all four factors tips in favor of the government. Id. at *16 (where the delay in securing a warrant for packages in the mail stream was 15 days, the court considered all of the factors, but particularly "how strongly factors two and three weigh against [the defendant]" to conclude that the delay was not unreasonable). Therefore, I conclude that the delay was not unreasonable.

### iii.    Warrantless Search

Matos argues that the dog sniff of his package constituted a warrantless search. Matos's Memorandum [57-2] at 16-18.  Generally, a "'canine sniff' does 'not constitute a search within the meaning of the Fourth Amendment.'" United States v. Iverson, 897 F.3d 450, 461 (2d Cir. 2018) (quoting United States v. Place, 462 U.S. 696, 707 (1983)).  "As long as the observing person or the sniffing canine are legally present at their vantage points when their respective senses are aroused by obviously incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred." Id.  Consequently, a canine sniff of a package temporarily removed from the mail stream is not a Fourth Amendment search. See United States v. Dillon, 810 F. Supp. 57, 60 (W.D.N.Y. 1992) (rejecting that canine "sniffs" of  United Parcel Service parcels constituted warrantless searches under the requirements of the Fourth Amendment); United States v. Quoc Viet Hoang, 486 F.3d 1156, 1160 (9th Cir. 2007) ("the Fourth Amendment is not implicated by the use of a dog sniff by a trained dog to detect contraband in a package"); United States v. Johnson, 25 F. Supp. 3d 1034, 1038 (W.D. Mich. 2014) ("[s]ubjecting the envelope [which was temporarily removed from the mail stream] to the dog sniff did not qualify as a search protected by the Fourth Amendment"); Goodin, 2019 WL 2385871, *5 ("[a] K-9 sniff is not a search within the meaning of the Fourth Amendment, but a K-9's positive alert to the presence of narcotics establishes probable cause for a search"). Therefore, I recommend that this portion of Matos's motion be denied.

####        iv.        **Tainted Dog Sniff**

As discussed above, Matos "does not contest the validity of the search warrant" (Notice of Motion [57] at 1). *See* Florida v. Harris, 568 U.S. 237, 246-47 (2013) ("[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search"). Instead, Matos offers several reasons why the canine search was allegedly tainted and require a hearing, including:

--        "Inspector Jaffe's unfettered discretion in arranging and staging the search of the package and his presence in the room while the search was being conducted was an outside influence, which contributed to a biased alert";

--        "[b]ecause Inspector Jaffe knew within which container suspected drugs may have been hidden, he unconsciously telegraphed signals to the dog as it got close to the target package";

--        "because Inspector Jaffe called upon Officer Nesci to perform a dog sniff of a package he suspected contained controlled substances, the dog hander (Nesci) was predisposed to finding the target package that contained drugs"; and

--        "Inspector Jaffe and the dog's handler were unconsciously cueing the dog to the presence of drugs and to the targeted package". Matos's Memorandum [57-2] at 19-20.

Relying on Harris, Matos argues that he may contest the reliability of the canine. Id. at 19. Addressing a *warrantless* search that was premised on probable cause provided by a canine alert, Harris recognized that while "a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search", where it is

appropriately certified, "[a] defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." 568 U.S. at 246-47. However, the only Fourth Amendment search that occurred here was the pursuant to a search warrant. *See* United States v. Carter, 2020 WL 6136480, \*7 (D. Minn. 2020), adopted, 2020 WL 6135901 (D. Minn. 2020) ("Harris deals with the standards applicable to a court's evaluation of whether probable cause existed to support a warrantless search. As such, Harris provides little guidance about how a probable-cause assessment should look through the deferential lens applicable [to a search warrant challenge]").

When challenging a search warrant, "[r]eview of probable cause must be based upon the four corners of the affidavit". United States v. Manor, 2011 WL 6056887, \*4 (D. Vt. 2011). Although Matos's motion is not framed as such, he must establish his entitlement to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), by making "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding". United States v. Levasseur, 816 F.2d 37, 43 (2d Cir. 1987). *See* United States v. Rojas-Camilo, 2016 WL 1069051, \*3 (D. Mass. 2016) ("[w]hile a judicial ruling on a motion to suppress is ordinarily confined to the 'four corners' of the affidavit, there are circumstances in which a defendant may challenge the truthfulness of statements made by the affiant in a so-called Franks hearing"); United States v. Arnold, 500 F. Supp. 3d 656, 657–58 (N.D. Ohio 2020) ("[e]xcept where a defendant raises . . . a challenge under Franks . . . evaluation of the adequacy of a search warrant is limited to the information presented in the four-corners of the affidavit"). The standard for

establishing an entitlement to a Franks hearing is a "high one". Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991).

Even if Inspector Jaffe's failure to include his "unconscious" actions in the supporting Affidavit could constitute a material omission or falsehood, Matos's wholly unsupported claims that Inspector Jaffe "unconsciously telegraphed" or "cue[ed]" the canine's positive alert fall well short of establishing his entitlement to a Franks hearing. See Falls v. (Police Officer) Detective Michael Pitt, 2021 WL 1164185, *44 (S.D.N.Y. 2021) ("[c]ourts have made clear that a plaintiff's own, uncorroborated statements do not constitute a sufficient offer of proof under Franks").

Similarly, in United States v. Robinson, 2020 WL 3962130, *1 (N.D. Ohio 2020), a canine alert to a mailed package led to the issuance of a search warrant for that package. The defendant sought a hearing to challenge the reliability of the canine's alert "by questioning the officers present at the post office", contending, like here, that the canine "may have alerted to this particular package because her handler cued her to it". Id. Relying on Harris, the defendant argued that he was entitled to an opportunity to challenge the canine's reliability. Id., *2. However, the court rejected that reliance, holding that a Franks hearing was the defendant's available remedy, and that "Harris . . . did not create an exception to the ordinary procedure leading up to a Franks hearing", which required him to "make a 'substantial showing' that the search warrant for the package was issued at least in part because of the affiant's false statement". Id.

At oral argument, I directed the government to produce certain discovery identified in Matos's Reply ([59] at 7-8) concerning the canine sniff of the subject parcel, as well

as the reliability of Zev and Officer Nesci, and permitted Matos to supplement his request for a hearing. *See* August 1, 2022 Text Order [68].  Following that production, Matos alleges that the government only produced some of the requested discovery, and from what has been produced thus far, he points to certain anomalies that he contends require a hearing. Matos's Supplemental Letter Brief [74] at 1, 3.

    Among the items produced by the government were a Deployment Report [74-3] and Police Report [74-4] prepared by Officer Nesci on October 29, 2020, which demonstrate that he was deployed to conduct a canine search of two other parcels at that time.  According to both documents, Zev alerted to all three parcels, the first of which was the subject parcel which was placed in the "weight room". [74-3] at 2; [74-4] at 1.  The second and third alerts occurred to parcels placed in the men's and women's locker rooms. Id. Although the subject parcel and a second parcel were found to contain cocaine, the search of the third parcel revealed "no measurable amount of narcotics and was believed to be a test package". Id.

    Matos contends that "[t]he specific, detailed and semi-non-conjectural relevant facts contained in the affidavit and reports of Officer Nesci . . . are sufficient to grant [his] request for a hearing on the merits of the canine search, especially when juxtapose[d] to Jaffe's sworn warrant affidavit". [74] at 4-5.  He points to several inconsistencies between Officer Nesci's reports and the search warrant application:

    --  the Deployment Report indicates that the package sniff occurred in a "weight room", rather than "office area" identified in the search warrant application.  Matos contends that the weight room "does not appear to be a secured area" [74] at 3;

--    although Inspector Jaffe stated that Zev only alerted to the subject parcel, the Deployment Report establishes that he alerted to two other packages (id. at 4); and

--    contrary to Inspector Jaffe, who indicated that the subject parcel was placed in an array of other packages known not to contain narcotics, he "[i]nstead . . . placed three packages that he suspected to contain drugs in three separate rooms that were accessible to innumerable individuals and Zev gave positive alerts to all three packages even though one package did not contain any drugs". Id.

None of these purported anomalies are persuasive. For instance, Matos assumes that the "weight room" was not a secure location, but that runs contrary to the Deployment Report and Police Report prepared by Officer Nasci, both of which state that Zev was "brought into a secured office area" and "given the narcotics sniff command" ([74-3] at 2; [74-4]), and is entirely consistent with Inspector Jaffe's supporting search warrant Affidavit, which stated that the search occurred "within a secured office area". [58-1] at 8, ¶11. Likewise, I find nothing false or materially misleading about Inspector Jaffe's failure to indicate in the search warrant application that canine sniffs of two other parcels were conducted at that time. The Deployment Report and Police Report prepared by Officer Nasci clearly indicate the package sniffs for those packages occurred in different locations and there is no indication that they were any way related to, or affected, this search.

Nor is there any indication that Zev's reliability was placed in question by the fact that one of the parcels he alerted to was found to contain no narcotics. Officer Nasci explained that he believed it to be a "test package" – i.e., a parcel no longer containing narcotics used by drug distributors to test the USPS's drug detection capabilities. "A detection dog recognizes an

odor, not a drug, and should alert whenever the scent is present, even if the substance is gone".
Harris, 568 U.S. at 246 n.2. Hence, "if the dog alerts to a [location] in which the officer finds no narcotics, the dog may not have made a mistake at all . . . . [T]he dog may have smelled the residual odor of drugs previously in the [location]". Id. at 245-46. For this reason, "records of a dog's field performance" are "in most cases . . . [of] relatively limited import". Id. at 245.

On this record, Matos falls short of the "substantial preliminary showing" necessary to establish his entitlement to a hearing. Therefore, I recommend that this motion be denied without a hearing.

However, recognizing that Matos may not have had the benefit of all of the discovery I directed to be produced [63], by September 16, 2022 the government shall produce, if it has not already done so, the items identified by Matos. *See* [74] at 2. If particular discovery does not exist or there are other reasons why it cannot be produced, the government shall so specify. Based on this additional discovery production, Matos may file a motion for a hearing on his motion to suppress by October 5, 2022.

### v.    The Search of the Box contained within the Package

Matos contends that the search of the hair dryer box found within the subject parcel exceeded the scope of the warrant. Matos's Memorandum [57-2] at 21-25. In response, the government argues that the search of that box was "contemplated by the warrant", which authorized the search of the package for specific items, all of which could be contained within the box. Government's Response [58] at 19-20.

The government has the better of this argument. As the Supreme Court has held

-18-

"[a] warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside". United States v. Ross, 456 U.S. 798, 821 (1982).  Although this case involves a parcel rather than a footlocker, I see no reason why that holding would apply differently.  Therefore, I recommend that this portion of Matos's motion be denied.

**2.      Motion for Fed. R. Civ. P. ("Rule") 16 Discovery**

"Rights of discovery in criminal cases, unlike in civil cases, are severely circumscribed." BCCI Holdings (Luxembourg), Societe Anonyme v. Pharaon, 1995 WL 489426, *4 (S.D.N.Y. 1995).  Apart from the government's Brady,[5] Giglio,[6] and Jencks Act (18 U.S.C. §3500) obligations, which are addressed separately, "Rule 16 is . . . the sole authorized vehicle under the Federal Rules of Criminal Procedure for pre-trial discovery in criminal cases". United States v. Louis, 2005 WL 180885, *2 (S.D.N.Y. 2005).

Matos moves pursuant to Rule 16 for various forms of discovery.  In response, the government represents that it "has complied with its obligations . . . by providing substantial voluntary discovery". Government's Response [45] at 2.  It also acknowledges that it "will continue to provide any discoverable materials in conformity with Rule 16 or in response to reasonable requests by the defendant".  Id. at 3.

"Where the Government makes good faith representations that it is complying with Rule 16, and that it will continue to do so, courts in this Circuit deny specific discovery requests." United States v. Zelaya-Romero, 2018 WL 1033235, *3 (S.D.N.Y. 2018).  "Those

---

[5]      Brady v. Maryland, 373 U.S. 83 (1963).
[6]      Giglio v. United States, 405 U.S. 150 (1972).

assurances are sufficient; the [g]overnment is not required to conduct a separate investigation for the purpose of responding to a defendant's discovery requests." <u>Id</u>.  In fact, Matos "accepts the Government's good faith assurances, as long as the Government remains mindful that discovery is not merely limited to that which is specifically requested and that they adhere to the District Court's trial Scheduling Order and their continuing duty to timely disclose". Matos's Supplemental Discovery Submission [70] at 2.  I have no reason to believe that the government does not understand these obligations.

Separately, Matos "requests that the Court require the Government to represent that [he] has made no statement to government agents before or after arrest, or that no such statements by [him] exist". Matos's Supplemental Discovery Submission [70] at 1.  Concerning its Rule 16(a)(1)(A) obligations to produce statements, the government represents that it has produced "recorded jail phone calls made by [Matos] between November 5, 2020 through February 4, 2021", and that if it becomes aware of additional statements by him to law enforcement, they will be produced.  Government's Response [45] at 6.  Since Rule 16(c) expressly recognizes the parties' continuing duty to disclose, I find no reason to require the government to conclusively represent that no additional statements exist at this time.  If a statement is later produced, Matos reserves all his challenges to the timeliness of the disclosure. Therefore, this motion is denied.

**3.    Motion for Production of <u>Brady</u>/<u>Giglio</u> and Jencks Act Material**

Matos "requests that the Court direct the Government to disclose <u>Brady</u>, <u>Giglio</u> and <u>Jencks</u> impeachment material, if any exists, in accordance with the common practice in this

district, prior to trial so long as it is disclosed in sufficient time for [him] to have a fair opportunity to utilize the information at trial in this case". Matos's Supplemental Discovery Submission [70] at 2. The government does not oppose these requests.

It agrees to produce Giglio and Jencks Act material, except where there are witness safety concerns, in accordance with the schedule set by the trial court. Government's Response [45] at 12-13. The government also acknowledges its continuing duty under Brady to provide defendant with exculpatory evidence. Government's Response [45] at 10-11. "The government's obligations under Brady . . . are seemingly well-established. The prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment . . . . This duty covers not only exculpatory material, but also information that could be used to impeach a key government witness." United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) (citing Giglio, 405 U.S. at 154). "[A]s a general rule, Brady and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant". Id. at 146. "[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." Id. at 144. "[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence . . . as well as the particular circumstances of the case". Id. at 146.

Based upon the government's representations, Matos's motion is denied. Consistent with Coppa, the government shall timely disclose Brady materials to defendant. See United States v. Hill, 2012 WL 912948, *5 (W.D.N.Y. 2012).

4.    **Preservation of Rough Notes**

Matos requests that the court "enter an Order holding in the event that any [rough notes and reports] that may not be Jencks material and that might exceed the Government's obligations for disclosure arise at trial, the same shall be subject to further instructions from the trial judge". Matos's Supplemental Discovery Submission [70] at 3.  Although it is not evident to me what particular relief Matos is seeking, as best as I can discern, this issue rests with the trial judge.  Therefore, the motion is denied, without prejudice to renewal before the trial judge.

5.    **Motion for Disclosure of Grand Jury Minutes**

Since "a presumption of regularity attaches to grand jury proceedings", United States v. Leung, 40 F.3d 577, 581 (2d Cir. 1994), "[t]he burden . . . is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy". Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400 (1959). *See also* United States v. Abcasis, 785 F. Supp. 1113, 1119 (E.D.N.Y. 1992) (defendant has the "burden of asserting that particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment"); United States v. Torres, 901 F.2d 205, 233 (2d Cir. 1990), abrogated on other grounds by United States v. Marcus, 628 F.3d 36 (2d Cir. 2010) (disclosure "is rarely permitted without specific factual allegations of government misconduct"); Leung, 40 F.3d at 582 ("[a] review of grand jury minutes should not be permitted without concrete allegations of Government misconduct").

"[T]his is a relatively demanding standard to satisfy". United States v. Greenberg, 2022 WL 827304, *26 (S.D.N.Y. 2022).  Hence, the "strong presumption of regularity in grand

jury proceedings . . . . cannot be outweighed by conclusory or speculative allegations of misconduct". United States v. Morgan, 845 F. Supp. 934, 941 (D. Conn. 1994), aff'd, 51 F.3d 1105 (2d Cir. 1995). *See* United States v. Sandford, 2016 WL 791435, *4 (W.D.N.Y.), adopted, 2016 WL 3951217 (W.D.N.Y. 2016) ("[u]nspecified allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden").

Matos acknowledges that he is "not aware of Government misconduct occurring in the case and do[es] not allege the same". Matos's Supplemental Discovery Submission [70] at 3. Nevertheless, he argues that a particularized need for disclosure exists because his co-defendants are his mother and stepfather, with whom he denies conspiring. Id. at 4. According to Matos, "he has a particularized need for disclosure as dismissal of Count 1 bares directly upon the sufficiency of subsequent Counts of the indictment and to impeach witnesses at trial, refresh recollection, and test witness credibility, which outweighs the Government's interest in maintaining Grand Jury secrecy". Id.

Matos's showing, which acknowledges the absence of any alleged misconduct, falls short of the particularized threshold required to warrant the disclosure of the grand jury minutes. *See* United States v. Bruno, 159 F. Supp. 3d 311, 322 (E.D.N.Y. 2016) ("[a] court will not authorize disclosure of grand jury minutes when the defendant alleges mere speculation as to what occurred in front of the grand jury. Rather, a defendant must present 'concrete allegations of Government misconduct' for a court to allow inspection of grand jury minutes"). Therefore, this motion is denied.

-23-

6.    **Motion for a Bill of Particulars**

Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense".  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).[7]  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999).  "[T]he burden is upon defendants to show that non-disclosure of the requested particulars would lead to prejudicial surprise at trial or would adversely affect defendants' rights".  United States v. Duarte, 2014 WL 29366, *1 (W.D.N.Y. 2014).

"In deciding a motion for a bill of particulars, the important question is whether the information sought is necessary, not whether it is helpful."  United States v. Conley, 2002 WL 252766, *4 (S.D.N.Y. 2002).  A bill of particulars "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense".  United States v. Henry, 861 F.Supp.1190, 1197 (S.D.N.Y. 1994).

The court "has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form".  United States v. Barnes, 158 F.3d 662, 665 (2d Cir.1998).  See United States v. Messina, 2012 WL 463973, *10 (E.D.N.Y. 2012) ("[i]n determining whether a defendant has shown such necessity, the trial

---

[7]    Some courts have questioned the double jeopardy justification for granting particularization. See, e.g., United States v. Payden, 613 F.Supp. 800, 816 n. 16 (S.D.N.Y. 1985).

court must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery"). "The necessity of a bill of particulars depends on the nature of the charged crime." United States v. Meregildo, 2012 WL 3834732, *5 (S.D.N.Y. 2012).

Although "there is a special concern for particularization in conspiracy cases", United States v. Palmer, 2012 WL 2953659, *3 (W.D.N.Y. 2012) (citing United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988)), "a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge". Barnes, 158 F.3d at 666. See United States v. Reddy, 190 F. Supp. 2d 558, 570 (S.D.N.Y. 2002) ("[c]ourts have granted requests for bills of particulars identifying co-conspirators in cases where the number of defendants was large, where the alleged conspiracy spanned long periods of time and where the alleged schemes were wide-ranging"). "Whether to grant a bill of particulars rests within the sound discretion of the district court." United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

Matos argues that Count 1 of the Indictment fails to "outline 'the conspiracy' . . . its background [or] the parties and the means and methods". Matos's Supplemental Discovery Submission [70] at 5. Count 1 of the Indictment [32] alleges that

> "[b]eginning on or before October 27, 2020 . . . and continuing until on or about November 3, 2020, in the Western District of New York, and elsewhere, the defendants, ESTEVEN MATOS, FELIX AYENDE, and LYDIA CORTES, did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others, known and unknown, to . . . possess with intent to distribute, and to distribute, 500 grams or more of a mixture and substance containing methamphetamine; 500 grams or more of a mixture and substance containing cocaine; and 40 grams or more of a mixture and substance containing [fentanyl] . . . . [a]ll in violation of [21 U.S.C. § 846]".

-25-

The conspiracy here is not complex or expansive.  In any event, Matos has the benefit of not only the discovery produced by the government thus far, but also the Criminal Complaint Affidavit [1].  Collectively, these are sufficient to enable him to prepare a defense, prevent unfair surprise at trial, and raise a double jeopardy bar. *See* United States v. Calvente, 2013 WL 4038952, *2 (S.D.N.Y. 2013) (denying a bill of particulars where "the Government has already provided much, if not all, Rule 16 discovery, and this Court will require it to provide Jencks Act material in advance of trial to apprise the Defendants of the essential facts"). *See also* United States v. Vendetti, 2013 WL 5522860, *13 (W.D.N.Y.), adopted, 2013 WL 5522434 (W.D.N.Y. 2013) ("[n]otwithstanding the government's opposition to defendants' motions for bills of particulars, its response to defendants' pretrial motions . . . includes an extensive introduction captioned 'Theory of the Case and Outline of the Proof' . . . amplifying the allegations of the Second Superseding Indictment. While not in the form of a bill of particulars, I deem it to constitute a bill of particulars").   Therefore, the motion is denied.

### 7.    Motion for Leave to Raise Additional Motions

Matos "requests permission, upon a showing of good cause relative to timeliness, to file other and additional motions . . . [that] may become necessary due to [the] Court's rulings and subsequently disclosed information or documents by the Government". Matos's Supplemental Discovery Submission [70] at 6.  To the extent that this relief is consistent with the requirement of Rule 12(c)(3), which requires a showing of good cause for why pretrial motions were not timely asserted, it is granted.

Matos also seeks leave to file additional motions with the trial judge. Matos's Supplemental Discovery Submission [70] at 6. That motion is premature and better resolved by the trial judge.

## B.    The Government's Cross-Motion for Reciprocal Discovery

The government cross-moves for the production of reciprocal discovery pursuant to Rule 16(b).  Government's Response [45] at 29.  "Rule 16 . . .  imposes reciprocal discovery obligations on defendants." United States v. Smith, 985 F.Supp.2d 506, 522 (S.D.N.Y. 2013). Matos has not opposed this request. Therefore, it is granted.

The government also asks that "upon the District Court's setting a trial date and accompanying Scheduling Order . . . the defendant provide a summary of any testimony that the defendant intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence". Government's Response [45] at 29.  Since Matos has also not opposed this request, it is granted.

## CONCLUSION

For these reasons, the government's cross-motion (Government's Response [45] at 29) is granted, Matos's remaining non-dispositive motions [42] are granted in part and denied in part, and I further recommend that Matos's motion to suppress [57] be denied.

By September 16, 2022 the government shall produce, if it has not already done so, the items identified by Matos. *See* [74] at 2.  If particular discovery does not exist or there are other reasons why it cannot be produced, the government shall so specify.  Based on this

additional discovery production, Matos may file a motion for a hearing on his motion to suppress by October 5, 2022.

Unless otherwise ordered by Judge Sinatra, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by September 16, 2022. Any requests for extension of this deadline must be made to Judge Sinatra.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: September 2, 2022

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

-28-